**SIGNED this 01 day of July, 2009.**

_____
**Marcia Phillips Parsons
UNITED STATES BANKRUPTCY JUDGE**

_____

**[This opinion is not intended for publication as the precedential effect is deemed limited.]**

<u>IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TENNESSEE</u>

| | |
|---|---|
| In re<br>    LOUIS MICHAEL SALLIE and<br>    MICHELLE DIANE SALLIE,<br><br>                  Debtors. | No. 08-50805<br>Chapter 7 |
| KNOXVILLE TVA EMPLOYEES<br>CREDIT UNION,<br><br>        Plaintiff,<br><br>vs.<br><br>LOUIS MICHAEL SALLIE and<br>MICHELLE DIANE SALLIE,<br><br>        Defendants. | Adv. Pro. No. 08-5034 |

<u>**M E M O R A N D U M**</u>

APPEARANCES:

        Thomas H. Dickenson, Esq.         Michael E. Large, Esq.
        Hodges Doughty & Carson            Large and Associates
        Post Office Box 869                   511 Alabama Street
        Knoxville, Tennessee 37901          Bristol, Tennessee 37620
        *Attorney for Plaintiff*                    *Attorney for Defendants*

**Marcia Phillips Parsons, United States Bankruptcy Judge**. In this adversary proceeding, Knoxville TVA Employees Credit Union (the "Credit Union") seeks judgment against Louis and Michelle Sallie (the "Debtors") and a determination that the judgment is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and (B). The Debtors assert a counterclaim for recovery of their costs and attorney's fees under 11 U.S.C. § 523(d) based on their contention that this action is not substantially justified. Trial in this matter was held on April 15, 2009. For the reasons discussed below, the court concludes that the Debtors' obligations are dischargeable, but that the Debtors are not entitled to recovery of their costs and fees. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(I).

I.

The Debtors filed for bankruptcy relief under chapter 7 on April 30, 2008. Thereafter, on July 28, 2008, the Credit Union commenced the current adversary proceeding. The Credit Union's complaint arises out of two loans that it made to the Debtors: (1) a loan in the amount of $26,035.77 on October 17, 2007, to refinance an indebtedness secured by a 2006 Dodge Charger automobile ("Charger Loan"); and (2) a loan in the amount of $32,578.94 on November 5, 2007, to finance the Debtors' purchase of a 2004 Lexus RX 330 automobile ("Lexus Loan"). The Credit Union contends that these loans are nondischargeable pursuant to § 523(a)(2)(A) because the Debtors failed to disclose that Michelle Sallie was not working regularly because of health problems, and, specifically as to the Charger Loan, that the Debtors misrepresented the features/options of the automobile. Alternatively, the Credit Union asserts that the two loans are nondischargeable pursuant to § 523(a)(2)(B) because the Debtors significantly misrepresented their income on loan applications.[1] The Debtors respond that any income misstatements were not materially false, that

---

[1] The parties' joint pre-trial statement, in its discussion of the Credit Union's causes of action, also includes the assertion that the Debtors failed to disclose a prior bankruptcy filing in their Lexus Loan application. However, the only proof offered in this regard is Louis Sallie's testimony from his 11 U.S.C. § 341 meeting that he filed for bankruptcy relief in 1995. No proof was offered as to what impact this knowledge or lack thereof would have had on loans in question. Accordingly, to the extent the prior filing is asserted as a basis for nondischargeability under § 523(a)(2)(B), it must be rejected because the Credit Union has failed to offer any evidence that the failure was
(continued...)

there was no intent to deceive, and that the Credit Union's reliance was not reasonable. The Debtors deny that they made any misstatements regarding the Charger automobile and, as to Michelle Sallie's health issues, argue that these issues were insignificant and did not adversely affect the Debtors' ability to repay the loans.

Both of the Debtors testified at trial, as well as four employees of the Credit Union. In addition, the Credit Union's proof included the Debtors' responses to certain requests for admissions propounded to them. In these responses, the Debtors admitted that the loan applications introduced into evidence by the Credit Union were true and exact copies of the loan applications submitted by the Debtors for the Charger and Lexus Loans; that the Debtors signed these loan applications; that Louis Sallie's "gross monthly income in October of 2007 was less than $5,416.00"; that Michelle Sallie's "gross monthly income in October of 2007 was less than $1,840.00"; that Michelle Sallie's "gross monthly income in November of 2007 was less than $1,840.00"; and that the Debtors "never disclosed to [the Credit Union] or its agents or employees that Michelle Sallie was out of work when [the Debtors signed the Charger and Lexus Loan applications]."

The testimony established that the parties' loan relationship began prior to the extension of the loans in question, when the Credit Union financed the Debtors' earlier purchase of a Jeep Cherokee on July 11, 2007. Although not discussed specifically, it appears that the Debtors also had a savings account with the Credit Union.

The Credit Union makes loans directly to its customers, either at its office locations or over the telephone, and indirectly through authorized automobile dealers. The Charger Loan was initiated by a telephone call to the Credit Union by Michelle Sallie on October 17, 2007. Mrs. Sallie talked with Bridget Clifton, a loan officer with the Credit Union, who obtained the necessary loan information from the both of the Debtors over the phone and then inputted the information into the Credit Union's computer system from which the loan documents, including a loan application, was prepared. Ms. Clifton testified that she had no independent recollection of the phone conversations in question. According to the loan application that she generated as a result of the phone call, the

---

¹(...continued)
material. *See infra* page 11 of this memorandum opinion.

Debtors wanted to refinance their loan from Eastman Credit Union, which was secured by the Debtors' 2006 Dodge Charger. The loan application indicated that Michelle Sallie was employed by King College and that her gross monthly income was $1,840; that Louis Sallie was employed by Team Sports, with gross monthly income of $5,416; and that the Debtors owed $23,000 on their home. According to the vehicle condition report prepared by Ms. Clifton based on her telephone conversations with the Debtors, the Dodge Charger was a four door sedan, with a V-6 engine, aluminum/alloy wheels, leather seats, power sunroof, and theft recovery system. The adjusted retail value of a 2006 Dodge Charger with these options pursuant to the NADA Online Used Car Guide was $20,075.

Ms. Clifton testified that after making a preliminary assessment of the loan application, she recommended to her supervisor, Brandy Jones, that she approve the loan to the Debtors, which she did. Ms. Jones testified that her approval of the loan was based on a review of the Debtors' account history with the Credit Union, the Debtors' credit history, credit report, vehicle information, income and debt-to-income ratio. Ms. Jones testified that a debt-to-income ratio guideline she utilized was 40% or less, and that the Charger Loan ratio, based on the income information set forth in the loan application and the debt data obtained from a credit report on the Debtors, was 38.6 percent.

On October 19, 2007, two days after applying for the loan by phone, the Debtors went to the offices of the Credit Union and signed the generated loan application, a promissory note, and security agreement. The Debtors did not sign or see the vehicle condition report prepared by Ms. Clifton that set forth the options on the Dodge Charger. Moreover, the Credit Union did not inspect the vehicle. Contrary to the vehicle condition report, the Charger did not have a sunroof, leather seats, or a theft recovery system, and both Debtors deny that they represented the automobile had these options.

On November 5, 2007, the Debtors purchased a 2004 Lexus RX 330 automobile from Parkway, a car dealership. Parkway provided the Debtors a loan application for a loan from the Credit Union to finance the purchase; the Debtors completed the application while they were at Parkway, which then submitted the application online to Lisa McDaniel, an loan officer with the Credit Union. This loan application provided that Louis Sallie was employed by Dixie Sporting

4

Goods and that his gross monthly income was $6,083. As with respect to the earlier loan application, Michelle Sallie's monthly income at King College was listed at $1,840. Both applications were signed by the Debtors, although Mr. Sallie denies that he represented that his income was $6,083.

Upon receiving the online application from Parkway, Ms. McDaniel reviewed the application, checked the credit report, value of collateral, account information, and debt-to-income ratio which was 49%. Ms. McDaniel testified that because the debt-to-income ratio was elevated, she asked Parkway to verify the Debtors' income and to require the Debtors to make a $3,400 down-payment. The Debtors made the required down-payment and sent the Credit Union their payroll statements, as well as a copy of a letter from Dixie Sporting Goods to Louis Sallie dated October 19, 2007, confirming the commencement of his employment and setting forth his compensation package. Ms. McDaniel then approved the loan to the Debtors.

On October 17, 2007, the date the Charger Loan was initiated, Louis Sallie was working for Team Sports as the application indicated. However, on October 19, 2007, the date the application was signed, Mr. Sallie began his employment with Dixie Sporting Goods. The October 19, 2007 letter from Dixie Sporting Goods indicated that Mr. Sallie would receive an annual compensation package of $67,360. The payment structure included a semi-monthly draw of $2,631.66 ($5,263.32 per month) and a $350 monthly travel allowance, plus eligibility for commission bonuses to the extent the draw and travel allowances were exceeded. The Debtors' Statement of Financial Affairs indicated that Louis Sallie earned $58,187 in 2007, and Schedule I reported gross monthly income for Mr. Sallie of $5262. At the Debtors' § 341 meeting of creditors, Mr. Sallie testified that his gross monthly income before taxes, including mileage, was $4,700.

Michelle Sallie was employed at King College from approximately October of 2005 through December of 2007, working 40 hours per week generally and earning $9.99 per hour. However, in February and March 2007, Mrs. Sallie was on sick leave for almost eight weeks after undergoing an emergency hysterectomy. Also, from September 9 or 10, 2007, to the day before Thanksgiving, Mrs. Sallie was again out on sick leave, suffering first from "colitis and a mass growing on [the] right side of [her] colon" and then strep throat. Mrs. Sallie testified that her sick leave began with

5

a five-day hospitalization and that upon her release from the hospital she was told that she could return to work in 14 days. However, when she returned to the doctor for a followup visit ten days later she was informed that the infection had not subsided and that she would need to be off from work for another 14 days. Mrs. Sallie testified that she kept going back to the doctor every ten days and each time she was told that she could return to work in 14 days, but at each subsequent ten-day checkup her return to work would be delayed another 14 days. As explained by Mrs. Sallie, "before they could actually release me they wanted to get a good colonoscopy, which means I had to get the infection out of my body from the colitis. . . . I had four colonoscopies in two months' time." Mrs. Sallie testified that at the time of the Charger Loan on October 19, 2007, she had been told that she would be able to return to work on October 28, 2007, but subsequently she was not released until November 12, 2007, when she then contracted strep throat, delaying her return to work until the day before Thanksgiving.

According to her pay stubs, Michelle Sallie's gross income from King College in September 2007 was $1,391.40; her October 2007 income was $359.64; and her November 2007 income was $239.75. Mrs. Sallie testified that she received sick and vacation pay during part of the time she was off from work during these three months. Mrs. Sallie's total income from King College for 2007 was $16,517.59.

At trial, the Debtors introduced a 2000 divorce decree between Michelle Sallie and a former husband. This divorce degree ordered the former husband to pay Mrs. Sallie child support for their two minor children. The Debtors testified that Mrs. Sallie was receiving $300 a month in child support at the time they obtained each of the loans from the Credit Union, although the Debtors did not disclose the child support in their bankruptcy schedules.

John Redwine, collections manager for the Credit Union, testified that the Debtors redeemed the Dodge Charger automobile and surrendered the Lexus, with the Credit Union thereafter selling the Lexus at auction. After giving the Debtors credit for the redemption payment on the Charger and for the sale proceeds on the Lexus, the balance owed by the Debtors on the Charger Loan was $11,451.05 and $16,539.86 on the Lexus Loan, for a total balance as of April 15, 2009, of $27,990.91, excluding attorney fees.

6

II.

Section § 523(a)(2) of the Bankruptcy Code provides in material part:

A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt–

. . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by–

> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
>
> (B) use of a statement in writing–
>
>> (i) that is materially false;
>>
>> (ii) respecting the debtor's or an insider's financial condition;
>>
>> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>>
>> (iv) that the debtor caused to be made or published with intent to deceive[.]

11 U.S.C. § 523(a)(2).

The party seeking a determination of nondischargeability bears the burden of proving the necessary elements by a preponderance of the evidence, *Grogan v. Garner*, 498 U.S. 279, 291, 111 S. Ct. 654 (1991), and § 523(a) is strictly construed against the plaintiff. *Rembert v. AT & T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998). The bankruptcy court possesses the jurisdiction and authority to adjudicate the Credit Union's claims and award any necessary damages, as measured by state law. *Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 792 (Bankr. E.D. Tenn. 2003) (citing *Longo v. McLaren (In re McLaren)*, 3 F.3d 958, 965 (6th Cir. 1993)).

Because "subsection (B) of § 523(a)(2) covers only statements 'respecting a debtor's financial condition' and subsection (A) expressly excludes such statements, the subsections 'are mutually exclusive.'" *In re Copeland*, 291 B.R. at 759. All statements regarding a debtor's financial condition, whether written or oral, are expressly excluded from subsection (A). Rather,

the creditor must proceed under subsection (B) and satisfy the requirement that the statement of financial condition be in writing. *Prim Capital Corp. v. May (In re May)*, 368 B.R. 85, 2007 WL 2052185, *7 (B.A.P. 6th Cir. July 19, 2007) (table opin.). A debt based upon an oral misrepresentation of financial condition is not actionable and will be dischargeable. *Id*. Accordingly, whether the Credit Union in the instant case may proceed under subsection (A) or (B) of § 523(a)(2) turns on whether the Debtors' alleged fraudulent representations are (i) oral or in writing and (ii) concern the Debtors' financial condition.

The alleged misrepresentations in this case pertain to the Debtors' statements of income, the Debtors' nondisclosure of Michelle Sallie's health issues, and the features/options of the Dodge Charger automobile. With respect to the statements of income, the statements were both oral and written. To obtain the Charger Loan, the Debtors orally represented their incomes over the telephone and then signed a loan application that set forth the represented income amounts. Similarly, on the Lexus Loan, the Debtors verbally reported their incomes to the car dealership, which then relayed the information to the Credit Union, with the Debtors subsequently signing a written loan application. Thus, whether the Credit Union may proceed under subsection (A) or (B) of § 523(a)(2) as to the misrepresentations of income turn on whether such statements constitute "a statement respecting the debtor's . . . financial condition." If so, then such misrepresentations are only actionable under § 523(a)(2)(B).

The phrase "statement respecting the debtor's . . . financial condition" is not defined in the Bankruptcy Code and the Sixth Circuit Court of Appeals has not addressed this issue directly. The Sixth Circuit Bankruptcy Appellate Panel, however, has rejected a "broad interpretation" of the phrase that would include any communication that has a bearing on a debtor's financial position, in favor of a "strict interpretation" that limits statements respecting a debtor's financial condition to "communications that purport to state the debtor's overall net worth, overall financial health, or equation of assets and liabilities." *In re May*, 2007 B.R. 2052185, *6 (quoting *Cadwell v. Joelson (In re Joelson)*, 427 F.3d 700, 705 (10th Cir. 2005)). This court concurs with that approach, having previously adopted a strict interpretation in a prior decision. *See White v. Applegate (In re Applegate)*, Adv. Pro. No. 04-2035, at 7 (July 20, 2005) (quoting *Skull Valley Band of Goshute Indians v. Chivers (In re Chivers )*, 275 B.R. 606, 615-16 (Bankr. D. Utah 2002) ("[T]he better

8

approach is the strict interpretation of § 523(a)(2)(B) that requires a false written statement to describe the debtor's net worth, overall financial health, or ability to generate income.").

Applying this criteria, the court concludes that statements regarding the amount of income earned by an individual are statements respecting financial condition, even under a strict interpretation. Other courts that have considered this issue agree. *See Midwest Comm. Fed. Credit Union v. Sharp (In re Sharp)*, 357 B.R. 760, 765 (Bankr. N.D. Ohio 2007) (Loan application to credit union that contained detailed information concerning the sources of the debtor's income, thereby enabling an assessment of her creditworthiness, qualified as statement respecting the debtor's financial condition within meaning of § 523(a)(2).); *Am. Nat'l Bank v. Dalcourt (In re Dalcourt),* 354 B.R. 868, 874 (Bankr. N.D. Iowa 2006) (Credit application that set forth the debtor's gross monthly salary was statement in writing respecting the debtor's financial condition because statement of debtor's ability to generate income, coupled with credit bureau report, provided an overall view of debtor's ability to pay debt.); *MBNA Consumer Servs. v. Jackson (In re Jackson)*, 252 B.R. 877, 878 (Bankr. W.D.N.Y. 2000) (Representation of annual income is "statement respecting debtor's financial condition" because "[i]nherently, income is a critical aspect of a debtor's financial condition."); *Phillips v. Napier (In re Napier)*, 205 B.R. 900, 905 (Bankr. N.D. Ill. 1997) (Rental application that contained statements about the debtor's employment, weekly gross earnings and additional income constituted a statement in writing concerning the debtor's financial condition.).

Accordingly, the court must evaluate the Debtors' alleged misstatements of income in the context of § 523(a)(2)(B). Under this provision, the Credit Union must establish "that the debt was obtained by the use of a statement (1) in writing; (2) that was materially false; (3) respecting the debtor's or an insider's financial condition; (4) on which the creditor to whom the debtor is liable for money, property, services or credit reasonably relied; that the debtor caused to be made or published with intent to deceive." *In re Copeland*, 291 B.R. at 780 (citing 4 *Collier on Bankruptcy* ¶ 523.08[2] (15th ed. rev. 2002).

The Credit Union contends that both of the Debtors misrepresented their incomes on the applications for both the Charger Loan and the Lexus Loan. Addressing first the Charger Loan, the

Debtors stated in their loan application that Louis Sallie's gross employment income per month was $5,416 and that Michelle Sallie's was $1,840. To carry its burden of establishing that these income amounts were false, the Credit Union introduced Debtors' responses to the Credit Union's First Request for Admissions, wherein the Debtors admitted that Mr. Sallie's "gross monthly income in October of 2007 was less than $5,416.00" and that Mrs. Sallie's "gross monthly income in October of 2007 was less than $1,840.00." At trial, Mrs. Sallie did not deny that her gross monthly income in October was less than $1,840. It is undisputed that Mrs. Sallie did not work in October because she had not been released by her doctor to return to work and that her only income in October was sick and vacation pay of $359.64. However, the mere fact that Mrs. Sallie did not make this amount in October did not render her representation in her loan application false. She was still employed by King College at the time she signed her loan application, and according to her testimony, believed that she would be returning to work on October 28, 2007. Nothing refuted this testimony or otherwise suggested that the health problems encountered by Mrs. Sallie were of a nature that she would be unable to return to work as anticipated. Moreover, the evidence establishes that Ms. Sallie did return to work full-time after she recovered from her illnesses. Her gross earnings for the month of December 2007 from King College were $1,982.96.

Nonetheless, how the $1,840 amount was arrived at as the amount of Michelle Sallie's monthly income is unclear. Mrs. Sallie admitted that she probably gave this amount to the Credit Union and when asked how she came up with that amount responded, "Well, I average – well, you know about $10 an hour. So I'm saying $400 a week times four in a month pay period. That's $1,600 and then I add my child support, which I received for almost ten years. . . . That comes up with about $1,900." If Mrs. Sallie employed this calculation as she asserts, then the court questions why the Credit Union wasn't told that her monthly income was $1,900. Further, the loan application represented that the $1,840 amount was Mrs. Sallie's monthly gross *employment* income, with no income listed from other sources. Thus, the critical inquiry is whether Mrs. Sallie's representation that she had $1,840 in gross employment income was truthful. At $9.99 per hour, assuming a 40 hour work week, a person would earn $20,779.20 annually or $1,731.60 monthly.[2] Mrs. Sallie's

---

[2] This court observes that the loan application for the prior July 11, 2007 loan from the Credit
(continued...)

10

payroll records from King College indicate that her monthly income from January through August 2007 averaged $1,563.01, while if September is included the average was $1,543.94. Based on these figures, which are all less than $1,840, the court finds that Michelle Sallie did not have gross employment income per month of $1,840 and therefore her representation that she did was false.

As for Louis Sallie, his admission that his monthly income in October 2007 was less than the $5,416 amount set forth in the Charger Loan application does not establish, in and of itself, that the application was false. The application specified "gross employment income per month"; it did not expressly ask what Mr. Sallie's income was for the month of October. No evidence was introduced regarding the amounts earned by Mr. Sallie at Team Sports prior to October 19, 2007, other than his general statement that he earned less at Team Sports that he did at Dixie Sporting Goods. However, beginning on October 19, 2007, the date that the Debtors signed the Charger Loan application, Louis Sallie's monthly income from Dixie Sporting Goods, including his $350 monthly travel allowance, was $5,613.32, as evidenced by his October 19, 2007 letter from his employer and the pay stub that he submitted in November in connection with the Lexus Loan. Thus, Louis Sallie's representation in the Charger Loan application that his gross employment income was $5,416 per month was not false.

Having concluded that the representation of Michelle Sallie's gross employment income was false, the next required element to establish nondischargeability is that the untruth was "material." "A materially false statement has been defined as[] one that contains that important or substantial untruth. The measuring stick of material falsity is whether the [creditor] would have made the loan if the debtor's true financial condition had been known." *Sansom v. First Nat'l Bank of Centerville (In re Sansom)*, 224 B.R. 49, 54 (Bankr. M.D. Tenn. 1998). In the present case, the Credit Union's

---

[2](...continued)
Union to the Debtors also indicated that Michelle Sallie's gross employment income was $1,840 from King College and that Louis Sallie's was $5,416 from Team Sports, the same figures that are in the October 17, 2007 Charger Loan application. The court surmises that when Mrs. Sallie called the Credit Union on October 17, 2007, to inquire about a second loan, the prior loan application was reviewed and Ms. Clifton simply asked Mrs. Sallie if their income was the same as it had been in July. Of course, that supposition does not address how the $1,840 amount was calculated when first given in July.

11

employees who approved the Charger Loan to the Debtors were not specifically asked about the discrepancy between Michelle Sallie's stated income and the amount she would have been earning if she had been back at work. Rather, their examination focused on the October income actually received by Mrs. Sallie and the fact that she was out on sick leave at the time the loan was made. Both Ms. Clifton and Ms. Jones testified that if they had evaluated the Charger Loan based on Mrs. Sallie's actual October income the loan would have been denied due to insufficient income, although Ms. Clifton equivocated somewhat on cross-examination, stating that if Mrs. Sallie had told her about the illness and that the doctor had said she could return to work at the end of October, then the temporary shortfall in income would "probably not" have made much difference.

Based on all of the evidence presented in this case, the court concludes Michelle Sallie's misrepresentation as to her gross monthly employment income was not material. Regardless of whether Mrs. Sallie's actual employment income was $1,731.60 monthly (40 hours per week at $9.99 per hour) or the $1,563.01 which was her monthly average from January through August, the difference between these amounts and the $1,840 represented, i.e. $108.40 or $276.99, is more than offset by the additional amounts earned by Louis Sallie at his new job at Dixie Sporting Goods and Michelle Sallie's child support.[3] At his new position, Mr. Sallie's income, including his travel allowance, was $197.20 more than set forth in the loan application and Mrs. Sallie's child support added another $300 per month. In light of these other amounts, the debt-to-income ratio utilized by the Credit Union in evaluating the Debtors' loan would not have been adversely impacted. Consequently, this court is unable to conclude that the Credit Union would not have made the loan if the Debtors' true financial condition had been known. Because the court concludes that with respect to the Charger Loan Louis Sallie's income representations were not false and that Michelle Sallie's representations were not materially false, the debt owed by the Debtors on the Charger Loan will not be excepted from discharge under § 523(a)(2)(B).

The court turns next to the issue of whether the balance owing on the Lexus Loan is

---

[3] The conclusion that the Credit Union would consider Mrs. Sallie's child support as income in evaluating the Debtors' loan application is inferred from the instruction on the application that: "You need not reveal income from alimony, child support, or separate maintenance payments unless you want it considered in evaluating the credit application."

12

nondischargeable under § 523(a)(2)(B). Again, the issue is the Debtors' alleged misrepresentation of their incomes on their loan application, with Louis Sallie's income listed at $6,083 and Michelle Sallie at $1,840. Undeniably, Mr. Sallie's income was not $6,083; as previously discussed his monthly earnings from Dixie Sporting Goods were $5,613.32. Mr. Sallie testified that he never told anyone that he made $6,083, and he denied that he wrote this amount on his application. He admitted that he signed the application, but suggested that the stated amount could have been a reference to both his and his wife's income added together or that the amount could have been penciled in after he signed it. Neither of these suggestions are logical. If the amounts of the Debtors' income had been totaled, the sum would have been closer to $7,000, and the application plainly had a separate space for the income of each applicant with Mrs. Sallie's income being stated separately. Moreover, there is no evidence supporting Mr. Sallie's theory that the amount may have been supplied after he signed the application. The income figure is of critical importance to the credit application and, therefore, would logically have been one of the first items of information gathered by the car dealership. Further, if Mr. Sallie signed an application with blanks, he did so at his own peril. *See, e.g., Commonwealth Land Title Ins. Co. v. Homer (In re Homer)*, 168 B.R. 790, 800 (Bankr. N.D. Ga. 1994) (Debtor's lack of actual knowledge of the contents of the loan application does not provide him with a shield from a fraud claim if he intended to mislead creditor or acted recklessly in failing to read the application.). Accordingly, the court concludes that the representation as to Louis Sallie's income was false.

With respect to whether the falsity was material, that is, whether it was an important or substantial untruth that would have made difference if the debtor's true financial condition had been known, the evidence in this case establishes that the Debtors' actual income was known by the Credit Union. One of the loan requirements imposed by Ms. McDaniel, the loan officer for the Credit Union that approved the Lexus Loan, was that the Debtors verify their income. To do that, the Debtors sent the Credit Union a copy of the October 19, 2007 letter from Dixie Sporting Goods, and a copy of Louis Sallie's November 15, 2007 earnings statement, which, consistent with the letter, showed semi-monthly earnings of $2,631.66 plus auto allowance of $350. The Debtors also sent Michelle Sallie's earnings statement for the period from August 31, 2007, through September 13, 2007, which showed an hourly rate of $9.99 and gross earnings of $665.17, with YTD gross

wages of $13,935.17. Ms. McDaniel admitted that her final loan approval decision was based on the Debtors' income verification. Thus, regardless of the falsity of the Debtors' income as represented in the application, by definition the untruth was not materially false since the Credit Union was aware of the Debtors' actual income.[4] Accordingly, the balance owed by the Debtors on the Lexus Loan will not be excepted from discharge under § 523(a)(2)(B).

### III.

The Credit Union's other bases for nondischargeability are that the Debtors misrepresented the options on the Dodge Charger automobile and failed to disclose Michelle Sallie's health problems. Because neither of these contentions constitutes statements (or omissions) regarding the Debtors' financial condition, they provide a basis for nondischargeability only if they satisfy the requirements of § 523(a)(2)(A) of the Bankruptcy Code. The Sixth Circuit Court of Appeals has held that in order for a debt to be excepted from discharge under this provision, the creditor must prove: (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of the loss. *See In re Rembert*, 141 F.3d at 281.

Turning first to the issue of the options on the Dodge Charger, the only proof that the Debtors made the misrepresentation in this regard is that the options were contained in the vehicle condition report prepared by Ms. Clifton after her conversations with the Debtors. However, Ms. Clifton had no independent recollection of the telephone conversations. Both Debtors denied making any misrepresentations as to the automobile's options, and they signed no document confirming or acknowledging the automobile's characteristics. Moreover, the loan application did contain an error in its statement that the mortgage balance on the Debtors' home was $23,000. Ms. Clifton testified that she would have obtained this figure from the Debtors' credit report, but the report indicated, consistent with the Debtors' testimonies, that they had two mortgages on their home, the first in the

---

[4] The Credit Union's knowledge of the Debtors' actual income amounts would also preclude it from being able to establish that it relied upon any misrepresentation of income, a necessary element of nondischargeability under § 523(a)(2).

amount of $150,00 and the second in the $20,000 range. Ms. Clifton's failure to set forth the correct mortgage amount in the application illustrates that mistakes do sometimes happen in the preparation of computer-generated documents. Considering all of the evidence in this case, the court concludes that the Credit Union failed to establish by a preponderance of the evidence standard that the Debtors misrepresented the options on their Dodge Charger automobile.

As to the Debtors' failure to disclose the fact that Michelle Sallie was on sick leave when the two loans were obtained, it is well established that "[f]raud may consist of silence, concealment or intentional non-disclosure of a material fact, as well as affirmative misrepresentation of a material fact." *In re Copeland*, 291 B.R. at 760. Ms. Jones testified that she would not have approved the Charger Loan if she had known that Michelle Sallie was not working at the time, with Ms. McDaniel making a similar statement regarding the Lexus Loan. This evidence indicates materiality. Nonetheless, the court concludes that there was no intent to deceive. "Whether a debtor possessed an intent to defraud a creditor within the scope of § 523(a)(2)(A) is measured by a subjective standard." *In re Rembert*, 141 F.3d at 281 (citing *Field v. Mans*, 516 U.S. 59, 70-72, 116 S. Ct. 437 (1995)). A debtor's subjective intent must be ascertained by the totality of the circumstances. *Id.* As previously addressed, at the time of the Charger Loan on October 19, 2007, Michelle Sallie was still employed by King College and her undisputed testimony was that she had been told that she would be able to return to work on October 28, 2007. Similarly, at the time of the Lexus Loan, Michelle Sallie had been released to go back to work, but had contracted strep throat before she was able to do so. Although Mrs. Sallie's recovery from colitis was protracted, her testimony that she believed that she would be going back to work at any time and that there would be no impact on the Debtors' ability to repay the loans was credible. Moreover, the evidence establishes that Michelle Sallie did return to work full-time in November after she recovered from her illnesses. Accordingly, the court concludes that the Debtors' failure to advise the Credit Union that Michelle Sallie was out of work was not the result of a dishonest intent to deceive the Credit Union.

IV.

The last issue in this case is whether the Debtors may recover their costs and attorney's fees incurred in the defense of this action. Under 523(d) of the Bankruptcy Code:

> If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances make the award unjust.

11 U.S.C. § 523(d). "A creditor's position is substantially justified if it has 'a reasonable basis in both law and in fact'. . . ." *Providian Bancorp v. Stockard (In re Stockard)*, 216 B.R. 237, 240 (Bankr. M.D. Tenn. 1997).

Although the parties did not specifically address this issue at trial, the court concludes, upon consideration of all of the evidence in this case, that the Credit Union's position was substantially justified. The Debtors did not disclose in the bankruptcy schedules the child support received by Michelle Sallie, and Louis Sallie testified at the § 341 meeting that his gross monthly income, "mileage and everything," was $4,700 per month, a statement that was inconsistent with what the Debtors had told the Credit Union at the time the loans were made. Although the Debtors testified that they misunderstood the question about child support, assuming that it was only asking if the Debtors were paying child support, and that Louis Sallie had misspoke about his income being before taxes, this evidence, upon consideration of all the other evidence in the case, provided a reasonable basis in fact and law for the Credit Union's cause of action.

V.

An order dismissing this action in its entirety will be entered in accordance with this memorandum opinion.

# # #